# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

JAMES C. PIERSON,          )
                       )
       Plaintiff,        )
                       )
v.                     )     **Case No. 3:11-cv-1126**
                       )     **Judge Trauger**
QG, LLC,             )
                       )
       Defendant.     )
                       )

## MEMORANDUM

Before the court is defendant QG, LLC's Motion for Summary Judgment (Docket No. 48), to which the plaintiff has responded (Docket No. 56), and the defendant has filed a reply (Docket No. 59). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND

The plaintiff, James C. Pierson, was formerly employed by the defendant, QG, LLC ("QG") as the Engineering Manager/Plant Facilities Manager ("Facilities Manager") at its Dickson, Tennessee plant.[1] In this action, the plaintiff, who at the time was 62, alleges that he was discharged from his employment on account of his age. (Docket No. 33 at 2-4.) He also

---

[1] Unless otherwise noted, the facts are drawn from QG's Statement of Uncontested Facts (Docket No. 49), the plaintiff's responses thereto and statement of additional material facts (Docket No. 55), QG's responses to the plaintiff's statement of additional material facts (Docket No. 60), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

alleges that his employer retaliated against him for complaining about age discrimination after his termination date. (*Id.* at 4-6.)

QG, based in Sussex, Wisconsin, is in the printing business. It has approximately 50 facilities nationwide and employs between 23,000 and 24,000 full-time employees. At the time the plaintiff commenced his employment in March 2005, the Dickson plant was owned by World Color (USA) Corp. ("World Color"). QG acquired World Color on July 2, 2010.

Following the World Color acquisition, Carl Lentz, who, at the time, served as QG's Regional Facilities Manager, possessed supervisory authority over the plaintiff. As Regional Facilities Manager, Lentz supervised QG plants located in Nashville and Dickson, Tennessee; Franklin, Kentucky; Jonesboro, Arkansas; and Augusta, Georgia. At all relevant times, Lentz reported to Joe Muehlbach, QG's former Executive Director of Facilities and Environmental Affairs.[2] Lentz was one of a number of regional leaders who reported to Muehlbach.

The World Color acquisition prompted QG to undertake certain consolidation activities, which included downsizing certain plants and closing others. On August 11, 2011, QG's President and CEO, Joel Quadracci, sent a companywide e-mail notifying employees that, in light of the prevailing economic climate, management was announcing a new initiative entitled "Fortress Quad." Among other things, the e-mail asked employees to "[l]ook for excess cost or waste in your job and in your department as a whole, and share your ideas with your manager."

---

[2] At his deposition, Muehlbach testified that, as of December 21, 2011, he became an Executive Director dedicated to acquisitions and integration.

At his deposition, Muehlbach stated that, one week later, he was instructed by his supervisor, Steve Jaeger,[3] to review each position within his scope of responsibility and determine which ones could be eliminated without causing hardship to the company. Muehlbach testified that he commenced his review immediately and contacted his regional leaders, including Lentz, to assist in this evaluation. He also stated that he performed his own private review of positions located at plants that he knew were potential targets for downsizing or closure. He testified that he possessed this knowledge through his participation in QG's acquisition of World Color and the subsequent integration of the two entities.[4] Aware that the Dickson plant was going to be downsized due to declining volumes and lost contract work, Muehlbach stated that he determined that the plaintiff's position was a proper target for elimination. In addition, Muehlbach testified that he determined that the position of David Hakenwerth, the Facilities Manager at QG's Jonesboro plant, could also be eliminated because he knew that that plant was going to be downsized and possibly closed.[5] Although Muehlbach was aware of the impending downsizing at Dickson and Jonesboro, he stated that this information was highly confidential and could not be shared with his management team.

As alluded to above, Lentz also played a role in the aforementioned review process. At his deposition, Lentz testified that he attended a meeting in Sussex, Wisconsin on August 19,

_____

[3] Jaeger is QG's President of Direct Marketing and Vice President of Information Technology and Infrastructure.

[4] Specifically, Muehlbach testified that, through his participation in the World Color acquisition and integration, he gained advance knowledge of all anticipated closures or reductions.

[5] The Jonesboro plant ultimately closed in 2012.

2011 that was attended by several managers and regional leaders, along with Jaeger, Muehlbach, and Christi Dees, a QG Human Resources Manager. According to Lentz, Jaeger and Muehlbach revealed at the meeting that there would be a reduction-in-force pursuant to the Fortress Quad initiative. Lentz added that he understood from this meeting that the Facilities Department would be expected to make some workforce reductions. After the meeting concluded, Lentz stated that he approached Dees and recommended the plaintiff and Hakenwerth, both of whom worked at plants over which he maintained supervisory authority, as two Facilities Department employees whose positions could be eliminated without detriment to the company. Following this conversation, Dees wrote an e-mail to Muehlbach, stating:

> Carl Lentz spoke with me after our meeting this morning. He indicated that we want to move forward with the reduction of Jim Pierson. Please confirm that you are ok with this. Carl would like to complete the meeting when he is in Dickson on Tuesday, so I need to know ASAP.

Two days later, on August 21, 2011, Muehlbach wrote to Dees confirming that "[y]es, we want to terminate."

Muehlbach testified that, after the decision to end the plaintiff's employment had been made, he relied on Dees and Lentz to carry out the termination. On August 22, 2011, Lentz completed Criteria Selection Forms for both the plaintiff and David DePriest, another QG employee who worked out of office space leased by the company in Franklin, Tennessee. DePriest was 47 at the time of the plaintiff's termination and worked as an Energy Manager. Lentz testified that, despite the fact that the decision to terminate the plaintiff had already been finalized, he completed these forms because he was told to do so by Dees, who had e-mailed them

to him.  He also stated that the plaintiff and DePriest were the two individuals "that were being compared for the reduction."  However, there is no evidence indicating that DePriest was being considered for termination.

The form calls for a supervisor to rate an employee along different metrics, including "overall productivity," "quality of work," "availability of overtime," "attendance," "teamwork," and "ability to perform work in other teams."  Lentz rated DePriest higher than the plaintiff overall and gave the plaintiff an "unacceptable" rating for the "teamwork" metric.  Lentz stated that his ratings on the form factored into his prior recommendation that the plaintiff's position should be a candidate for reduction.  Lentz also testified that, when he arrived at Dickson on August 22, 2011, he told Sandra Snyder, the plant's Human Resources Manager, that he was terminating the plaintiff, in part, because he was not a "team player."  Snyder wrote "Team Player" in her notes summarizing this discussion with Lentz.[6]  She also wrote the words "Replacement," "Removed from," and "David DePriest."

On August 23, 2011, the plaintiff met with Lentz and Snyder and was informed that he was being discharged from his employment.  At the meeting, Lentz read from a script sent to him by Dees and informed the plaintiff that his termination was part of a reduction-in-force at the

---

[6] At his deposition, Lentz testified that Bill Gray, the Dickson Pressroom Department Manager, previously expressed his concerns about the plaintiff's communication and management of certain pressroom projects.  Lentz also had his own concerns about how the plaintiff worked with other people and managed projects.  On August 3, 2011, prior to the announcement of the Fortress Quad initiative, Lentz had discussed with the plaintiff a plan to transfer management responsibilities over certain projects to DePriest and another engineer, Adam Dillard.  The plaintiff testified at his deposition that he did not believe that this anticipated change was the product of age discrimination.

company. At no time was the plaintiff told that his termination resulted from his failure to be a "team player." The plaintiff was also given a form at the meeting showing that he was being terminated, while a 47 year-old employee (presumably, DePriest) was being retained. The form, which appears to have been generated from QG's Human Resources Department, stated that employees "were selected for termination based on job function, business need, performance and skill set."

When asked about the Criteria Selection Forms at his deposition, Muehlbach stated that he was surprised that they were completed because the plaintiff's termination represented a case where a single person at a single plant was being eliminated. He added that such forms were typically completed when there is an evaluation of a group of people holding similar positions. Muehlbach repeatedly testified that his decision to terminate the plaintiff was not based on his work performance. In its interrogatory responses, the company took the position that, while the Criteria Selection Forms were neither essential nor dispositive, they provided additional support to the decision to eliminate the plaintiff's position as part of a reduction-in-force. Muehlbach was also asked about the form given to the plaintiff during the August 23, 2011 meeting. He believed that this form was misapplied because the plaintiff's termination was not based on his job performance or skill set.

Shortly after the plaintiff was discharged from his employment, QG terminated the employment of Hakenwerth, the Facilities Manager at the Jonesboro plant. Lentz similarly completed Criteria Selection Forms for Hakenwerth and the employee who assumed many of his

duties, Gerry Waldo.[7]  In the forms, Waldo received a higher overall rating than Hakenwerth.
Muehlbach testified that the decision to terminate Hakenwerth had already been made prior to the
completion of these forms.[8]  Although Hakenwerth was older than Waldo, the plaintiff does not
believe that Hakenwerth's termination was the product of age discrimination because there was
not a significant age disparity between the two individuals.[9]

Between August and December 2011, QG eliminated the positions of 7 other Facilities
Department employees companywide.  At Dickson, QG chose not to fill the vacancy left by
Facilities Department employee James Wetterau after he resigned.  In addition, Muehlbach
testified that, including the plaintiff and Wetterau, there was a reduction of approximately 12 to
13 positions at the Dickson plant during a two-month period beginning in August 2011.  Since the
World Color acquisition in July 2010, the number of full-time employees at the Dickson plant has
decreased from 245 to 101, representing a 60 percent reduction.  Companywide, QG has
eliminated approximately 4500 positions over that same time period.

The plaintiff's Facilities Manager duties were assumed by DePriest.  Prior to the
plaintiff's termination, DePriest's job responsibilities included energy management, energy
procurement, and project support for local plants.  On August 24, 2011, Jerry Ulickey, the

---

[7] Waldo's Criteria Selection Form reflects that it was completed by both Lentz and Tony
Nicholson, a QG Regional Production Support Manager.

[8] Muehlbach also expressed his belief that these forms were misapplied in Hakenwerth's
case because it similarly involved a single position elimination and performance played no role
in his termination decision.

[9] According to QG, Hakenwerth's date of birth is October 9, 1961, while Waldo's is
December 21, 1965.

Dickson Plant Director at the time, wrote to all plant employees, informing them that DePriest had joined the facility in the role of Plant Facilities Manager. A Dickson plant roster also identified DePriest as the Plant Facilities Manager.

DePriest nonetheless testified at his deposition that, even after assuming the plaintiff's Facilities Manager duties, he continued to work on energy management, energy procurement, and project support activities for other plants. Indeed, the August 24, 2011 letter from Ulickey noted that DePriest would continue to have regional responsibilities that included helping QG's Nashville and Franklin, Kentucky plants with facilities and energy related projects. In addition, with the exception of an approximately three-week period that coincided with the beginning of his time at Dickson, DePriest reported to Robert Douglas, QG's Corporate Energy Manager.[10] Douglas completed DePriest's 2011 performance evaluation, which noted that, in addition to performing a facilities management role at Dickson, DePriest remained an integral member of QG's energy management team. While DePriest stated that he no longer devoted as much time to energy procurement tasks due to his expanded portfolio, he maintained that he was still involved with that aspect of his job responsibilities. At his deposition, the plaintiff testified that, while he lacked precise knowledge concerning DePriest's energy procurement experience, he nonetheless believed that DePriest possessed experience in that area that he did not have.

The plaintiff alleges that he was far more qualified than DePriest to perform the Facilities Manager position. Specifically, he relies on his: (1) over 39 years of experience in the printing

---

[10] At his deposition, DePriest testified that it was his belief that the Dickson plant roster erroneously listed his supervisor as being Carl Lentz as of August 28, 2011. In any event, he testified that this error was later corrected, as the plant roster reflected that Douglas was his supervisor effective September 19, 2011.

industry, including more than six years at the Dickson plant; (2) excellent performance reviews; (3) extensive experience in the "gravure" printing operations that occurred at Dickson; (4) extensive boiler room and solvent recovery experience; (5) environmental compliance and reporting experience; and (6) energy management and capital projects experience. He notes that DePriest lacked experience in "gravure" printing and solvent recovery prior to assuming the plaintiff's Facilities Manager duties. According to the plaintiff, DePriest lacked virtually any experience working in the printing industry prior to joining World Color in 2009, had far less experience managing capital projects, and had little experience with environmental compliance and reporting.[11]

Following his termination, the plaintiff unsuccessfully requested that QG increase his severance pay. In rejecting the plaintiff's request, the company explained that he was offered the standard separation package and that it does not make any exceptions, as it has denied previous requests for increases in severance pay. Upon receiving this news, the plaintiff sent an e-mail to Dickson Human Resources Manager Snyder on September 19, 2011, stating that he had concerns that his termination was related to age.

Snyder responded that day, noting that QG maintains an internal appeal process and that the plaintiff was welcome to appeal the termination decision. The following day, the plaintiff

---

[11] The plaintiff also asserts that, while he was never written up for any performance deficiencies, DePriest allegedly exhibited some in relation to two solvent recovery projects at the Dickson plant prior to the date of the plaintiff's termination. For instance, the plaintiff asserts that Lentz was apparently frustrated with DePriest's inability to complete drawings showing solvent recovery duct work at Dickson. The plaintiff also asserts that DePriest had sent him specifications for a vapor line containing certain errors and omissions that the plaintiff revised with Lentz's approval.

inquired whether the appeal option remained available to him, in light of the fact that the Separation Data Sheet given to him on the date of his termination expressly stated that an employee "must submit a written request for an appeal hearing within 14 days of your termination." This is consistent with QG's Employee Appeal Process policy, which requires that an appeal request "must be received within 14 days of the disputed action." Under this policy, the plaintiff's window to appeal his termination closed on September 6, 2011. In his e-mail to Snyder, the plaintiff explained that he had not requested an appeal because he had applied for the Safety Manager position at QG's Franklin, Kentucky plant immediately after his termination and was optimistic that he would be rehired.

On September 21, 2011 Snyder wrote an e-mail to the plaintiff confirming that he was correct in noting that the appeal deadline had passed. Nonetheless, she added that, if the plaintiff had a concern, he was encouraged to speak with Jane Downs, a QG Human Resources Director. The plaintiff wrote to Downs the same day, formally requesting an appeal of his termination on the basis that he was better qualified than DePriest, his "replacement." He acknowledged that his appeal request was outside the 14-day window, but he explained that he possessed extenuating circumstances for the out-of-time request - namely, that he was pursuing the Safety Manager position at the Franklin, Kentucky plant.

The plaintiff's appeal request was ultimately forwarded to QG Employee Advocate Haide Villarreal. Upon receiving the appeal request, Villarreal wrote an e-mail to the plaintiff on October 4, 2011, informing him that she would be reviewing all the facts surrounding his request to determine whether QG could proceed with his appeal. Villarreal also pointed out that the 14-day period for submitting an appeal request had passed. On October 11, 2011, Villarreal notified

the plaintiff through an e-mail that his request for an appeal was denied because it was not submitted within 14 days of the date of his termination, as required by company policy. She noted that, although she understood the special circumstances surrounding the plaintiff's delay, the company nonetheless needed to follow its policy in fairness to others who appeal outside the 14-day window.[12]

Villarreal prepared notes detailing the factors she took into consideration while reviewing the plaintiff's appeal request. The notes outline the events leading up to his request made on September 21, 2011. They also highlight two points she took into consideration in determining whether the company should make an exception and hear the plaintiff's out-of-time appeal. First, the notes express the concern that if QG made an exception for the plaintiff, it would have to do the same for others or else risk legal exposure stemming from an inconsistent application of the 14-day requirement. Second, the notes acknowledged the plaintiff's September 19, 2011 e-mail to Snyder in which he expressed his concern that he was selected for termination instead of his "replacement" due to his age. Villarreal rejected the plaintiff's allegation, writing that QG did not hire anyone to replace the plaintiff in his position, but that, instead, DePriest assumed the plaintiff's duties. She also wrote that the termination decision was based on the plaintiff's performance, not age. Finally, Villarreal pointed out that, even if the company made an exception

_____

[12] Villarreal also informed the plaintiff that the requisition had closed for the Safety Coordinator position that he previously applied for. It is undisputed that the Safety Coordinator position has not been re-posted. Instead, the duties of the position were distributed to Ron Irlinger, the Safety Coordinator at the Dickson plant. It is further undisputed that, in light of the Fortress Quad initiative, all job postings were closed on August 21, 2011 and had to be re-approved. Since the plaintiff's termination, QG has neither posted any engineering jobs nor hired additional employees in engineering positions in the Facilities Department.

and heard the plaintiff's appeal, it would be unable to reinstate his employment, since his position was no longer available. According to the plaintiff, QG denied his appeal request in retaliation for his prior complaint of age discrimination.

The plaintiff commenced the instant action on November 28, 2011 (Docket No. 1) and filed an Amended Complaint on July 2, 2012, asserting claims for age discrimination and retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq.*[13] (Docket No. 33 at 1.) QG filed the pending motion on January 11, 2013. (Docket No. 48.)

## ANALYSIS

### I. Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the

---

[13] In addition to the age discrimination and retaliation claims already discussed, the plaintiff previously alleged that QG also discriminated and/or retaliated against him when it: (1) failed to rehire him to the Safety Coordinator position located at the Franklin, Kentucky plant; and (2) failed to provide him access to an internal job posting board following his termination. In his response to QG's motion, the plaintiff voluntarily abandoned both of these claims. (Docket No. 56 at 2, n.1.)

evidence, the court must draw all inferences in the light most favorable to the non-moving party."

*Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the

party's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 249, 252.  An issue

of fact is "genuine" only if a reasonable jury could find for the non-moving party.  *Moldowan*,

578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     The Defendant's Motion

### A.       Age Discrimination

The ADEA makes it unlawful for an employer to discharge an employee "because of such

individual's age."  29 U.S.C. § 623(a)(1).  A plaintiff may establish age discrimination through

either direct or circumstantial evidence.  *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th

Cir. 2009).  Because the plaintiff's claim relies on circumstantial rather than direct evidence of

discrimination, the court will employ the well-known *McDonnell Douglas* burden-shifting

framework.[14]  *See id.* at 622.  (noting that the *McDonnell Douglas* burden-shifting framework is employed to analyze ADEA claims based on circumstantial evidence).

To establish a prima facie case of age discrimination under the ADEA using circumstantial evidence, a plaintiff must show that: (1) she belonged to a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class.  *Geiger*, 579 F.3d at 622.  When the termination arises as part of a work force reduction, the fourth element of the prima facie case is modified to require the plaintiff to provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).  "Once a plaintiff satisfies his or her prima facie burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).   If the employer meets this burden, the burden of

---

[14] The court will also apply the same analytical framework to the plaintiff's THRA claim.  "Tennessee courts have looked to federal case law applying the provisions of the federal anti-discrimination statutes as the baseline for interpreting and applying the [THRA]."  *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (internal quotation marks and citations omitted); *see also Blandford v. Exxon Mobil Corp.*, 483 F.App'x. 153, 157 (6th Cir. 2012) ("Age discrimination claims brought under the THRA are evaluated using the same analysis" employed to review claims brought under the ADEA); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006) ("We apply the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA").  Although the Tennessee Supreme Court, in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010), had rejected application of the *McDonnell Douglas* burden-shifting framework to THRA claims as inconsistent with the Tennessee standard for summary judgment, *Gossett* was abrogated by statute, effective June 10, 2011.  *See* Tenn. Code Ann. § 4-21-311 (2011).  The plaintiff initiated this action on November 28, 2011.  (Docket No. 1.)  Accordingly, the court will analyze the plaintiff's ADEA and THRA claims in the same manner.

production shifts back to the plaintiff to demonstrate that the employer's proffered explanation is a mere pretext for intentional age discrimination. *Id.* Throughout the operation of this burden-shifting framework, the burden of persuasion remains on the ADEA plaintiff at all times "to demonstrate 'that age was the 'but-for' cause of [the] employer's adverse employment action." *Geiger*, 579 F.3d at 620 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 n.4 (2009)).

**(1)     Prima Facie Case**

The first three elements of the prima facie case are not in contention. Instead, the parties dispute whether this is a true work force reduction case requiring the plaintiff to provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes*, 896 F.2d at 1465. "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Id.* An employee is not eliminated as part of such a reduction if he is replaced after his discharge. *Id.* "However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id.* Indeed, a person is replaced "only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.*

The plaintiff argues that he was not eliminated as part of a reduction-in-force because DePriest replaced him. However, the record evidence undermines the plaintiff's assertion, as it shows that DePriest not only assumed the plaintiff's responsibilities upon reporting to the Dickson plant, but also retained his preexisting duties pertaining to energy management, energy procurement, and project support for other local plants. DePriest testified that he continued to

maintain these duties after reporting to Dickson. In addition, the August 24, 2011 letter sent to all

Dickson employees by Plant Director Jerry Ulickey noted that DePriest would be assuming the

role of Facilities Manager in addition to maintaining his regional responsibilities that included

helping the Nashville and Franklin, Kentucky plants with facilities and energy related projects.

Moreover, for all but approximately three weeks, DePriest reported to Robert Douglas, QG's

Corporate Energy Manager. In his 2011 employee evaluation of DePriest's job performance,

Douglas noted that, in addition to assuming the Facilities Manager duties at Dickson, DePriest

continued to remain an integral part of QG's energy management team.

The plaintiff attempts to support his argument by pointing to DePriest's deposition

testimony, wherein he stated that, after he began reporting to Dickson, he was not as focused on

energy procurement activities as he once was. However, the fact that energy procurement played

a less prominent role in DePriest's work portfolio after he assumed the plaintiff's duties does not

establish that he ceased performing such tasks altogether. The plaintiff also contends that, after

DePriest assumed his duties, he spent most of his time at Dickson and had rarely traveled to

provide support to other plants. But even if it were the case that DePriest spent the majority of

his time working at Dickson, plainly, that fact is not mutually exclusive with DePriest also

traveling to other locations to provide support activities. DePriest testified that, a few months

after he reported to Dickson, he began providing assistance to QG's Nashville plant in

approximately December 2011. (Docket No. 51-2 at 46.) While it is true that DePriest's travel

expense reimbursement report contains only two entries for travel after he assumed the plaintiff's

duties, he explained that he did not seek reimbursement for the aforementioned travel to

Nashville, since it was a shorter distance from his home in Franklin, Tennessee than was Dickson,

the location to which he generally reported.  (*Id.* at 150-52, 209-14.)  In any event, it is

undisputed that the two entries on the travel expense reimbursement form reflected trips DePriest

made to provide support to another plant in the region located in Versailles, Kentucky.[15]  (*Id.* at

153, 214.)

The plaintiff next contends that his argument is bolstered by the fact that Dickson Human

Resources Manager Sandra Snyder wrote the words "Replacement," "Removed from," and

"David DePriest" in the notes she took of her August 22, 2011 conversation with Carl Lentz.

However, it is not entirely clear what these words suggest, as they are not strung together to form

a complete sentence or phrase, but are instead isolated from one another.  (*See* Docket No. 51-4 at

403.)  But even assuming that they suggest that Snyder believed that the plaintiff was being

replaced by DePriest, that belief would not settle the matter under the test articulated in *Barnes*,

which compels an inquiry into the scope of the duties performed by the person handling the

departing employee's responsibilities.  *Barnes*, 896 F.2d at 1465.  Here, that inquiry demonstrates

that DePriest did not simply step into the plaintiff's shoes when he reported to Dickson.  Instead,

he assumed the plaintiff's duties in addition to maintaining his own preexisting responsibilities.

Accordingly, the court finds that the plaintiff was terminated as part of a reduction-in-

force.  QG eliminated the plaintiff's position in the wake of the Fortress Quad initiative.  Indeed,

the same business considerations caused QG to eliminate Hakenwerth's position as the Jonesboro

Facilities Manager a short time later.  Besides these two individuals, 7 other Facilities Department

---

[15] The plaintiff also asserts that DePriest was no longer involved in projects outside of
Dickson.  However, to support this contention, he relies on inadmissible hearsay statements
made to him by outside contractors who worked at the Dickson and Nashville plants.  (Docket
No. 51-3 at 135-37.)

employees saw their positions eliminated between August and December 2011. According to

Muehlbach's uncontradicted testimony, there was a reduction of approximately 12 to 13 positions

at Dickson during a two-month period beginning in August 2011. And, more generally, since the

World Color acquisition in July 2010, there has been a sixty percent reduction in the number of

full-time employees at Dickson. Companywide, QG has eliminated approximately 4500 positions

over the same period of time.

Because the court has found that the plaintiff was terminated as part of a reduction-in-

force, he must adduce additional evidence tending to indicate that QG singled him out for

impermissible reasons when it terminated his employment. *Barnes*, 896 F.2d at 1465. The

plaintiff attempts to satisfy this requirement by arguing that he "possessed qualifications superior

to those of a younger co-worker working in the same position." *Id.* at 1466. Specifically, he

argues that he was far more qualified to perform his job than DePriest was. However, to satisfy

this test, the plaintiff must demonstrate that "all of the relevant aspects of his employment

situation were nearly identical" to those of DePriest. *Ercegovich*, 154 F.3d at 352; *see also*

*Kremp v. ITW Air Mgmt.*, 478 F. App'x 931, 932 (6th Cir. 2012).

The plaintiff cannot make this showing. It is evident that the plaintiff and DePriest did not

work in the same position. The plaintiff was formerly employed as a Facilities Manager at the

Dickson plant, whereas DePriest previously served as an Energy Manager working out of office

space in Franklin, Tennessee. According to the plaintiff's own testimony, DePriest's main

responsibility in his prior role was procuring energy. (Docket No. 51-3 at 78.) He does not

similarly claim that energy procurement constituted one of his primary roles when he was

employed as Facilities Manager in Dickson. Indeed, at his deposition, the plaintiff conceded that

DePriest possessed energy procurement experience that he did not have. (*Id.* at 79.) In addition, Muehlbach testified that DePriest's position was never considered for reduction because the company relied on his energy procurement experience. (Docket No. 51-4 at 166.) Specifically, he testified that DePriest's unique experience with energy procurement was a resource QG otherwise lacked. (*Id.*) Muehlbach also added that, while DePriest's supervisor, Douglas, possessed procurement experience, he did not share DePriest's experience in restructuring hundreds of utility contracts in the wake of the World Color acquisition. (*Id.* at 166-67.) Taken together, these facts show that the plaintiff's job was not "nearly identical" to DePriest's.[16] Thus, having failed to present additional evidence that QG discharged him for impermissible reasons, the plaintiff has failed to establish a prima facie case of age discrimination.

### (2)    Pretext

Even if the court assumes that the plaintiff made out a prima facie case, he nonetheless has failed to show that QG's proffered reason for terminating him - the reduction-in-force- was pretext for age discrimination. A plaintiff can establish pretext by demonstrating that "(1) the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the challenged conduct], or (3) that they were *insufficient* to motivate [the challenged conduct]." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) *overruled on*

---

[16] In a footnote in his opposition brief, the plaintiff also asserts that he was far more qualified for retention than Adam Dillard, a Facilities Engineer stationed at QG's Nashville plant who, after the plaintiff's termination, also began to assist in process safety management projects at Dickson. (Docket No. 51-2 at 157, 164; Docket No. 56 at 18, n.6.) Dillard is in his mid-twenties and has reported to DePriest throughout his employment at QG. (Docket No. 51-2 at 157.) The plaintiff's attempt to compare himself to Dillard is unavailing, as he has failed to demonstrate how the relevant aspects of Dillard's role as a Facilities Engineer in Nashville were nearly identical to his role as Facilities Manager at Dickson.

*other grounds by Gross*, 557 U.S. at 179.  Here, the plaintiff appears to argue that QG's proffered reason had no basis in fact.

To support his argument, the plaintiff first repeats his assertion that his position was not eliminated but that, instead, QG replaced him with DePriest.  However, as explained above, the court has already considered and rejected this contention.  The plaintiff next asserts that QG did not undertake any downsizing at Dickson in 2011.  However, as *Barnes* makes clear, a reduction-in-force can exist even when only one person's position is eliminated.  *Barnes*, 896 F.2d at 1465 ("A work force reduction situation occurs when business considerations cause an employer to eliminate *one* or more positions within the company") (emphasis added).  In addition, as the court noted above, Muehlbach offered uncontradicted testimony that approximately 12 to 13 positions were eliminated at Dickson during a two-month period beginning in August 2011.  Moreover, the plaintiff's reliance on the fact that QG invested $3 million in the Dickson plant in 2011 does not help his argument, as Muehlbach testified at his deposition that, even with a downsizing, it would be necessary to make additional capital investments to keep a plant's infrastructure operational. (Docket No. 51-4 at 202-03.)

The plaintiff next contends that QG's conduct after it decided to terminate the plaintiff is highly suspicious and shows that the reduction-in-force was pretextual.  Specifically, he points to the fact that Lentz completed Criteria Selection Forms comparing the plaintiff and DePriest notwithstanding the fact that DePriest was never a candidate for termination.  Again, Lentz received the Criteria Selection Forms from Dees and completed them accordingly for both the plaintiff and Hakenwerth.  The plaintiff was also provided with a document generated by Human Resources giving him the impression that both he and DePriest were being compared in

connection with the position reduction. While the court views QG's execution of the plaintiff's reduction-in-force to have been confusing and perhaps even haphazard, it does not believe that the aforementioned evidence reasonably raises an inference of age discrimination. *See Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 270 (6th Cir. 2010) ("Moreover, even if we assume that Defendant's evaluation process was haphazard . . . there exists no reasonable inference that Defendant discriminated on the basis of age") (internal quotation marks and citations omitted).

The plaintiff also contends that QG has offered shifting justifications for its decision to discharge the plaintiff. Specifically, he asserts that, while Muehlbach emphasized that the plaintiff's performance played no role in his termination decision, Lentz testified that the plaintiff's failure to be a team player factored into his recommendation and that he informed Snyder that the plaintiff was being discharged, in part, for his lack of teamwork. The Sixth Circuit has held that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). However, the record shows that Muehlbach was the ultimate decision-maker with respect to the plaintiff's termination decision. And, again, in explaining the reason for his decision, Muehlbach repeatedly testified that the plaintiff was discharged due to a reduction-in-force and that his performance played no role in his analysis.

Nonetheless, even Lentz testified that his recommendation to terminate the plaintiff's employment stemmed from the Fortress Quad initiative and that he believed that the Dickson Facilities Manager position could be eliminated without detriment to the company. While Lentz's recommendation may have also been shaped by his views concerning the plaintiff's performance -

namely, his teamwork - any alleged inconsistency between his explanation and the one offered by Muehlbach is immaterial, given the circumstances. *See Aldridge v. City of Memphis*, 404 F. App'x 29, 38-39 (6th Cir. 2010) (noting that the extent to which an employer's "shifting justifications are probative of pretext depends upon the circumstances of a given case and the magnitude of the inconsistency") (internal quotation marks and citations omitted). Indeed, the necessity of eliminating positions pursuant to the Fortress Quad initiative is a common thread between the deposition testimony of both Muehlbach and Lentz and has always been at issue. Thus, QG has consistently justified its termination decision on the grounds that it was part of a reduction-in-force.[17]

Again, the record demonstrates that the plaintiff's position was eliminated as part of a reduction-in-force following the announcement of the Fortress Quad initiative. Indeed, it shows that, after his termination, the plaintiff was not replaced. Instead, his duties were assumed by DePriest, who also retained his own preexisting responsibilities. Although the plaintiff may disagree with QG's business decision, he has simply failed to present sufficient evidence from which a jury could reasonably find that the reduction-in-force was itself a pretext for age

---

[17] The plaintiff also cites to the notes prepared by QG Employee Advocate Haide Villarreal in support of his contention that the company proffered shifting justifications for its termination decision. Specifically, he relies on the fact that Villarreal's notes concerning his appeal request state that he was terminated due to his performance and not age. However, the plaintiff omits the preceding sentence in her notes, which states that the plaintiff was not replaced after his termination, but that instead, his duties were assumed by DePriest. The presence of this language appears to confirm QG's view that the plaintiff was terminated as part of a reduction-in-force.

discrimination.[18]  Accordingly, for the foregoing reasons, QG's motion for summary judgment with respect to the plaintiff's ADEA and THRA age discrimination claims will be granted.

## B.    Retaliation

The plaintiff alleges that QG retaliated against him for complaining about age discrimination when it denied his untimely post-termination appeal request.  The ADEA makes it unlawful for an employer to retaliate against an employee for opposing or reporting age discrimination.  29 U.S.C. § 623(d); *Blizzard v. Marion Tech. College*, 698 F.3d 275, 288 (6th Cir. 2012).  As is the case with a discrimination claim, a plaintiff may show retaliation through either direct or circumstantial evidence.[19]  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008).  "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's decision."  *Id.* at 543-44.  Indeed, such evidence "requires the conclusion that unlawful retaliation was a motivating factor in the employer's action."  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003).  Here, the plaintiff asserts that QG Employee Advocate Haide Villarreal's consideration of his September 19, 2011 e-mail containing his age discrimination complaint while

---

[18] The plaintiff also suggests, in a footnote in his opposition brief, that QG could be held liable for age discrimination under the "cat's paw" theory.  (Docket No. 56 at 23.)  This theory applies where "a biased subordinate, who lacks decision-making power, influences the unbiased decisionmaker to make an adverse [employment] decision, thereby hiding the subordinate's discriminatory intent."  *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009).  However, the plaintiff's reliance on this theory is misplaced because he has failed to present any evidence showing that Lentz harbored any discriminatory animus toward the plaintiff.

[19] Again, the court applies the same analysis to the plaintiff's ADEA and THRA retaliation claims.  (*See supra* n. 13.)

determining whether to make an exception to the 14-day appeal requirement constitutes direct evidence of retaliation. However, this contention is without merit because even if believed, Villarreal's consideration of the complaint, by itself, would not require the conclusion that QG unlawfully retaliated against the plaintiff.

Thus, the plaintiff is left with establishing his retaliation claim through circumstantial evidence. ADEA retaliation claims based on circumstantial evidence are examined under the same *McDonnell Douglas* burden-shifting framework employed to assess age discrimination claims. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). The plaintiff bears the initial burden of demonstrating a prima facie case by showing that: (1) he engaged in protected activity when making his age discrimination complaint; (2) the defendant knew about his exercise of the protected activity; (3) the defendant thereafter took an adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* at 491-92. If the plaintiff is able to make out a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for [its action]." *Id.* at 492 (internal quotation marks and citations omitted). If the defendant is able to do so, the burden shifts back to the plaintiff to show that the defendant's "proffered reason was not the true reason for the employment decision." *Id.* (internal quotation marks and citations omitted).

Even when evaluated under the aforementioned burden-shifting framework, the plaintiff's retaliation claim cannot withstand summary judgment. Indeed, the plaintiff cannot establish a prima facie case because he has failed to present evidence showing that he suffered an adverse

employment action. Such an action is defined as one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Here, the court fails to see how QG's denial of the plaintiff's untimely appeal request would dissuade a reasonable worker from making a charge of discrimination. The plaintiff nonetheless contends that the denial of his appeal was no trivial matter because, if successful, he could have potentially been reinstated to his former position. (Docket No. 56 at 27.) However, the record indicates that there was no reasonable prospect of reinstatement, since the plaintiff's Facilities Manager position was eliminated as part of a reduction-in-force and what remained was, in essence, a new position in which DePriest assumed the plaintiff's duties and retained his own preexisting responsibilities. Given these circumstances, the court believes that no reasonable jury could find that QG's allegedly retaliatory conduct was so adverse that it would dissuade a reasonable employee from complaining about age discrimination.

However, even if the court were to assume that the plaintiff established a prima facie case, he has nonetheless failed to demonstrate that QG's proffered reason for denying his appeal request was a pretext for unlawful retaliation. QG asserted that it denied the plaintiff's appeal request because it was untimely under the company's policy requiring that such requests be made within 14 days of the disputed action. Again, the plaintiff can establish that this proffered reason was a pretext by demonstrating that it (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to motivate the challenged conduct. *Manzer*, 29 F.3d at 1084. The plaintiff attempts to prove pretext by showing that QG's denial of his appeal request

was not actually motivated by the fact that it was made outside the applicable 14-day window. The plaintiff raises three arguments to advance his position.

First, he contends that Employee Advocate Villarreal's consideration of the plaintiff's age discrimination complaint in the course of determining whether to allow his appeal to proceed shows that the failure to comply with the 14-day requirement did not actually motivate QG's decision.  However, Villarreal's notes show that she considered the plaintiff's age discrimination complaint for the express purpose of determining whether QG should make an exception to its policy and hear the untimely post-termination appeal request.  The notes further reflect that, based on her assessment that his complaint of age discrimination lacked merit, Villarreal determined that the company should not stray from its established policy that appeals must be made within 14 days of a disputed action.  The plaintiff has failed to offer any evidence showing that Villarreal's decision was otherwise influenced by any animus toward the plaintiff for previously complaining about age discrimination. Accordingly, this argument lacks merit.

The plaintiff next contends that QG's Employee Appeal Process policy states that "[v]ariations of the appeal procedure may be necessary based upon the facts and circumstances of a particular appeal." (Docket No. 56 at 28.)  The plaintiff fails to explain, however, how the existence of this sentence in the aforementioned policy demonstrates that QG's reliance on the 14-day requirement was pretextual.  In fact, the record evidence shows that QG did not believe that the plaintiff presented circumstances necessitating an exception to the 14-day requirement. In reaching this conclusion, Villarreal's notes reflect a preference for maintaining consistency with respect to the application of this requirement, so as to avoid the potential for legal exposure.

They also summarize her finding that the plaintiff's age discrimination complaint lacked merit. Nor can the plaintiff rely on the above-quoted sentence to claim that he was treated any differently from other employees, as there is no evidence in the record showing that QG has deviated from its 14-day requirement to accommodate any other employee's untimely appeal request. This contention is also without merit.

Finally, the plaintiff attempts to prove pretext by arguing that Sandra Snyder encouraged him to appeal his termination decision notwithstanding the fact that the 14-day appeal window had passed. But the plaintiff's argument does not accurately characterize the record evidence, which shows that, after Snyder realized that the 14-day deadline had passed, she encouraged the plaintiff to speak with Human Resources Director Jane Downs to express any concerns he had about his termination. In any event, as QG notes, the plaintiff's untimely appeal request was made after he complained of age discrimination to Snyder. However, instead of immediately denying the plaintiff's request as being out-of time, the record shows that QG's Human Resources staff allowed the plaintiff to receive more formal consideration of whether the company should make an exception to its well-settled policy of requiring appeals to be made within 14 days of a disputed action. The company ultimately determined that such an exception was unwarranted in light of the circumstances surrounding the plaintiff's case. Again, while the plaintiff may disagree with that determination, he has failed to present any evidence from which a reasonable jury could conclude that QG's reliance on its 14-day policy was a pretext for unlawful retaliation. Accordingly, summary judgment will be granted to the defendant as to the plaintiff's ADEA and THRA retaliation claims.

## **CONCLUSION**

For all of the reasons discussed herein, the defendant QG, LLC's Motion for Summary

Judgment (Docket No. 48) will be **GRANTED**.

An appropriate Order will enter.

_____

ALETA A. TRAUGER
United States District Judge