# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed:  April 18, 2014

Mr. Douglas B. Janney III
Law Office
2002 Richard Jones Road, Suite B-200
Nashville, TN 37215

Ms. Laura A. Lindner
Littler Mendelson
111 E. Kilbourn Avenue, Suite 1000
Milwaukee, WI 53202

Re:  Case No. 13-5784, *James Pierson v. Quad/Graphics Printing Corp., et al*
Originating Case No. : 3:11-cv-01126

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Keith Throckmorton

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0079p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

JAMES C. PIERSON,

*Plaintiff-Appellant,*

*v.*

QUAD/GRAPHICS PRINTING CORP. et al.,

*Defendants,*

QG, LLC,

*Defendant-Appellee.*

No. 13-5784

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville
No. 3:11-cv-01126—Aleta Arthur Trauger, District Judge.

Argued: March 13, 2014

Decided and Filed: April 18, 2014

Before: MERRITT, MOORE, and CLAY, Circuit Judges.

———————————

#### COUNSEL

**ARGUED:** Douglas B. Janney III, Nashville, Tennessee, for Appellant. Laura A. Lindner, LITTLER MENDELSON P.C., Milwaukee, Wisconsin, for Appellee. **ON BRIEF:** Douglas B. Janney III, Nashville, Tennessee, for Appellant. Laura A. Lindner, LITTLER MENDELSON P.C., Milwaukee, Wisconsin, for Appellee.

―――――――――――

# OPINION

―――――――――――

KAREN NELSON MOORE, Circuit Judge.  James Pierson, a Plant Facilities Manager at the Dickson, Tennessee plant of QG, LLC ("QG"), was terminated after the CEO announced a comprehensive company-wide cost-cutting initiative.  After he was fired, his job duties were assumed by a substantially younger employee engaged in energy-procurement and capital-projects management functions who had been based at another facility.  Pierson argues that QG discriminated against him on the basis of age when it replaced him with a younger individual who was less qualified to perform his job functions.  QG, on the other hand, asserts that Pierson's position was eliminated as part of a company-wide reduction in force.  Because we find evidence in the record to establish a genuine factual dispute regarding whether Pierson's position was eliminated or whether he was replaced by a younger individual, we **REVERSE** the district court's grant of summary judgment in favor of QG and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

QG is a printing company with approximately fifty printing facilities and 23,000 to 24,000 full-time employees world-wide.  R. 51-4 (Muehlbach Dep. at 99–101) (Page ID #1037–39).  In 2010, QG acquired World Color, another printing company, which had previously done business under the name Quebecor World.  As part of this acquisition, QG assumed control over a printing facility in Dickson, Tennessee.  James Pierson was the Plant Facilities Manager at the Dickson plant, and QG retained him in that role after the acquisition.  Pierson had thirty-nine years of experience in the printing industry, including extensive experience with the "gravure" printing process used at Dickson.  Over the nearly seven years that Pierson worked at the Dickson plant, first for World Color and then for QG, he never received a negative performance evaluation.  Nor was he ever disciplined, reprimanded, or warned about performance deficiencies.  Pierson's direct supervisor was Carl Lentz, QG's Southeast Regional Facilities

No. 13-5784        *Pierson v. Quad/Graphics Printing Corp et al.*        Page 3

Manager.  Lentz reported directly to Joe Muehlbach, the Executive Director of Facilities and Environmental Affairs.

On August 11, 2011, Joel Quadracci, QG's President and CEO, notified all employees that the company was "shifting to 'Fortress Quad' mode."  R. 51-3 (Quadracci Email at 2) (Page ID #917).   Although Quadracci assured employees "that Quad/Graphics remains financially strong," he described Fortress Quad as "a call for all hands on deck to batten down the hatches and stay focused on the key drivers of our business success."  *Id.* at 1–2 (Page ID #916–17).  In the email, he instructed all employees to "[l]ook for excess cost or waste in your job and in your department as a whole."  *Id.* at 2 (Page ID #917).   On August 18, 2011, Quadracci, in private communications, also instructed Muehlbach and other executives to "review every position within the company [and] make a determination on whether those positions were truly needed."  R. 51-4 (Muehlbach Dep. at 28–29) (Page ID #966–67).  Muehlbach initially identified Pierson and David Hakenewerth, the Plant Facilities Manager at the Jonesboro, Arkansas plant, as potential targets for termination.  He reasoned that both men were managers at plants that would be "going through significant downsizing or potential closure [and g]iven the size of the facility, it was felt that their responsibilities could be assumed by others without adding labor."  *Id.* at 63 (Page ID #1001).  QG was considering reducing operations at the Dickson plant, even though the facility provided some services that were not available at other plants and could not be shut down entirely.   *Id.* at 70 (Page ID #1008).   At the time, only Muehlbach and other senior-level executives knew that the Dickson plant might be downsized; neither Lentz nor any human resources employees were aware that QG was considering a reduction plan.   Muehlbach maintains that Pierson's "performance had no bearing on" Muehlbach's decision to discharge him.  *Id.* at 157 (Page ID #1095).

To assist him in selecting positions that could be reduced or eliminated, Muehlbach turned to Lentz and the other Regional Facilities Managers.  At a meeting on August 19, 2011, Muehlbach instructed his regional managers to identify positions under their supervision that could be eliminated without hardship to the company.  Lentz immediately identified Pierson and Hakenewerth as employees whose positions could be reduced.  With regard to the Dickson plant, Lentz felt that facilities management functions could be assumed by David DePriest, an Energy

Manager working out of office space in Franklin, Tennessee. After the meeting, Lentz relayed his decision to Christi Dees, the Corporate Human Resources Manager. Dees, in turn, informed Muehlbach that Lentz had selected Pierson and Hakenewerth for discharge. Muehlbach approved the termination decision, and Dees advised Lentz that he could proceed with Pierson's termination the following week. R. 51-1 (Muehlbach/Dees Email) (Page ID #415).

On August 22, 2011, Lentz informed Sandra Snyder, the Human Resources Manager for the Dickson plant, that he would be visiting the plant the following day to discharge Pierson. He explained that his decision rested in part on Pierson's failure to be a "team player." R. 51-1 (Lentz Dep. at 32–33) (Page ID #299–300). In her notes of the conversation, Snyder recorded the phrases "Team Player," "[r]eplacement," and "[r]emoved from," but she did not indicate any logical relationship between the phrases. R. 51-1 (Snyder Notes) (Page ID #390). Lentz also told Dees and Jerry Ulickey, the Dickson Plant Director, that Pierson was being terminated because of interpersonal problems. Lentz had formed an unfavorable impression of Pierson's ability to work in a team because Bill Gray, a primary customer of Pierson's services, reported concerns relating to Pierson's responsiveness and communication skills. R. 51-1 (Lentz Dep. at 33) (Page ID #300).

On August 23, 2011, Pierson was terminated. He was sixty-two years old. Lentz read from a "script" provided by human resources that explained that Pierson was being terminated as part of a reduction in force. *Id.* at 78–80 (Page ID #345–47). Lentz did not mention that the termination was a result of poor teamwork or any other performance issue. Lentz then gave Pierson a letter concerning his eligibility for release benefits, which compared his position to that of David DePriest and explained that the discharge was "based on job function, business need, performance and skill set." R. 51-4 (Release Agreement Ltr.) (Page ID #1398). In preparation for the termination meeting, Lentz prepared "Criteria for Selection" forms for Pierson and DePriest that purported to compare them for elimination. R. 51-1 (Lentz Dep. at 88–89) (Page ID #355–56); *id.* (Criteria for Selection Forms) (Page ID #417–20). The forms were actually intended for situations when several people holding identical positions were to be compared for

reduction. However, after Pierson's and Hakenewerth's[1] terminations were approved, human resources instructed Lentz to complete the forms for both Pierson and Hakenewerth, and he did so. R. 51-4 (Muehlbach Dep. at 196) (Page ID #1134). Pierson received a lower score than DePriest, in part because Lentz gave Pierson the lowest possible score for "teamwork." R. 51-1 (Criteria for Selection Forms) (Page ID #417–20). Muehlbach maintains that the decision was based entirely on a need to reduce employee headcount, particularly at Dickson, and that Pierson's performance was not a factor he considered. R. 51-4 (Muehlbach Dep. at 63, 209) (Page ID #1001, 1147).

After Pierson's termination, DePriest assumed Pierson's duties at the Dickson plant, including managing the infrastructure and preparing environmental reports. He was forty-seven years old. On August 24, 2011, Ulickey posted an announcement at the Dickson plant, which stated that "David Depriest [sic] has joined the Dickson Facility in the roll [sic] of Plant Facilities Manager. . . . In his role, David will have responsibilities for the Dickson Facilities area in addition to regional responsibilities that include helping Nashville and Franklin with facilities and energy related projects." R. 51-4 (Ulickey Announcement) (Page ID #1400). DePriest began spending the majority of his time—between three and five days per week—at the Dickson plant. After the Franklin corporate offices closed in late 2011, DePriest transferred his office space to the Dickson plant and used that facility as his base.

DePriest, Muehlbach, and Lentz all maintain that, although DePriest's physical work location changed after he assumed Pierson's duties, he continued to perform his energy procurement and other duties in addition to the Facilities Manager duties. DePriest recognized that his "duties changed" and that he was "not as focused on the energy procurement" tasks. R. 51-2 (DePriest Dep. at 35) (Page ID #465). Tim Heggie, a manager at Dickson, also informed Pierson that DePriest was spending most of his time at the Dickson plant performing Pierson's job functions. R. 51-3 (Pierson Dep. at 132–36) (Page ID #786–90). However, Robert Douglas, DePriest's direct supervisor, noted in DePriest's performance evaluation that DePriest continued to operate as an integral member of the energy management team. Douglas and outside

[1]Hakenewerth was compared to Gerry Waldo, an existing employee at the Jonesboro plant who assumed most of Hakenewerth's duties until the Jonesboro plant closed. R. 51-1 (Criteria for Selection Forms) (Page ID #421–24).

consultants handled some aspects of energy procurement, but DePriest had unique experience servicing many of QG's energy contracts.  R. 51-4 (Muehlbach Dep. at 166) (Page ID #1104). DePriest also began reporting fewer business trips after he moved his office space to Dickson. He explained that he stopped recording many of his trips, including his frequent trips to Nashville, because Dickson was farther from his home than the Franklin office space, and "the mileage differential that [he] would report on would need to be above and beyond the mileage from [his] home to Dickson."  R. 51-2 (DePriest Dep. at 151) (Page ID #581).  Additionally, all QG employees were instructed to reduce their travel as part of the Fortress Quad initiative.  *Id.* at 153 (Page ID #583).  Finally, although a chart mapping QG's internal reporting structure showed that DePriest began reporting to Lentz as the Dickson Facilities Manager on August 28, R. 51-1 (Reporting Structure) (Page ID #392), DePriest claims that he continued to report to Douglas, his supervisor on the energy team, and that the reporting change was a mistake which was corrected within a few weeks.  R. 51-2 (DePriest Dep. at 99) (Page ID #529).

Notwithstanding Pierson's alleged additional responsibilities, DePriest's work hours did not change.  DePriest continued to work 45–65 hours per week. R. 51-2 (DePriest Dep. at 102–03) (Page ID #532–33).  Pierson maintains that the position of Plant Facilities Manager entails a "huge workload," R. 51-3 (Pierson Dep. at 92) (Page ID #746), and it is not possible that DePriest assumed those responsibilities while retaining his preexisting duties pertaining to energy management.  The parties dispute whether or not "corporate resources" assisted with some aspects of Pierson's former job duties.  DePriest maintains that he alone assumed the responsibilities and duties of Plant Facilities Manager.  R. 51-2 (DePriest Dep. at 115) (Page ID #545).

After Pierson's termination, QG underwent a long period of contraction, at both the Dickson plant and other printing facilities.  Muehlbach testified that Pierson's termination was at the "leading edge" of the company-wide workforce reduction.  *Id.* at 67 (Page ID #1005). Within days of Pierson's termination, Jim Wetterau, another Dickson facilities employee, resigned and QG decided not to fill his position.  His duties were absorbed by "corporate resources," who may have also assisted with some aspects of Pierson's former job duties.  R. 51-4 (Muehlbach Dep. at 230–32) (Page ID #1168–70).   Shortly thereafter, QG discharged

Hakenewerth, the Facilities Manager at the Jonesboro plant, and directed Gerry Waldo, an existing employee, to absorb his duties. In the two-month period after Pierson's termination, QG eliminated approximately a dozen more positions at the Dickson plant. *Id.* at 202 (Page ID #1140). QG also reduced operations at Dickson from five printing presses to three, although the company did infuse significant capital into plant infrastructure to keep the gravure presses, unique to the Dickson plant, operational. *Id.* at 202–03 (Page ID #1140–41). Between July 2010 and July 2012, Dickson's overall workforce was reduced by sixty percent, from 245 to 101 employees. *Id.* at 48 (Page ID #986).

Pierson filed a complaint alleging age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq.* R. 33 (Am. Compl.) (Page ID #169–75). After QG filed a motion for summary judgment, the district court granted the motion and dismissed the case. The district court concluded that Pierson could not establish a prima facie case of age discrimination because he provided no evidence to show either that his position was not eliminated as part of a reduction in force or that he was singled out for elimination based on age during the company-wide terminations. R. 68 (D. Ct. Mem. at 15–19) (Page ID #1677–81). In addition, even if Pierson could prove his prima facie case, the district court found no evidence that QG's purported reason for terminating him—namely, the company-wide reduction in force—was pretext for discrimination. Although "QG's execution of [Pierson's] reduction-in-force [was] confusing and perhaps even haphazard," the district court ultimately concluded that Muehlbach alone made the decision to eliminate Pierson's position as a cost-saving measure. *Id.* at 20–21 (Page ID #1682–83). The district court also granted summary judgment in favor of QG on Pierson's retaliation claims. *Id.* at 23–27 (Page ID #1685–89). Pierson appealed only the district court's grant of summary judgment on his age-discrimination claims.

## II.  STANDARD OF REVIEW

We review de novo a district court's decision to grant a motion for summary judgment. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is appropriate when the moving party can "show[] that there is no genuine dispute as to any material fact and

No. 13-5784          *Pierson v. Quad/Graphics Printing Corp et al.*          Page 8

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We must view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, if the nonmoving party is unable to present sufficient evidence to permit a reasonable jury to find in its favor, the court should grant summary judgment in favor of the movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.  ANALYSIS

The ADEA forbids an employer "to discharge . . . or otherwise discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Discharged employees may prove a violation of the ADEA using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  Under this framework, the employee first has the burden of proving a prima facie case of age discrimination; if he is successful, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for taking the allegedly discriminatory action.  Finally, the employee bears the burden of proving that the employer's justification is pretext for discrimination.  *Id.*  The employee must ultimately show that "age was the 'but-for' cause of the employer's adverse action."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).  We assess age-discrimination claims brought under the THRA using the same analysis as those brought under the ADEA.  *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006).[2]

---

[2]Traditionally, an employee asserting a claim under the THRA bore the burden of showing that his age was "a determining factor" in the adverse employment decision.  *Flynn v. Shoney's, Inc.*, 850 S.W.2d 458, 460 (Tenn. Ct. App. 1992).  However, because the Tennessee Supreme Court generally evaluates claims brought under the THRA in the same way as claims brought under federal statutes, we have applied the same "but-for" causation standard to both ADEA and THRA claims in the years since the Supreme Court decided *Gross*.  *See Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153, 157 (6th Cir. 2012); *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 & n.7 (6th Cir. 2010).  It is by no means certain that the Tennessee Supreme Court would choose to adopt the *Gross* standard; in other contexts, Tennessee courts have chosen to deviate from heightened federal causation standards for claims brought under the THRA.  *See Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 29 (Tenn. 2011) ("[A] THRA claim does not require a showing of sole causation as does a Whistleblower Act claim.").  However, in the wake of *Gross*, no Tennessee court has explicitly addressed the causation standard for an age-discrimination claim brought under the THRA.  The parties do not argue that the "a determining factor" standard would alter the outcome in this case, and thus we have no occasion to address the current state of Tennessee law.

## A.  Prima Facie Case

Typically, to prove a prima facie case of age discrimination, an employee must demonstrate that "(1) he or she was a member of a protected age class (i.e., at least forty years old); (2) he or she suffered an adverse employment action; (3) he or she was qualified for the job or promotion; and (4) the employer gave the job to a younger employee." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007).  However, when an employee is terminated as part of a reduction in force, the employee must meet a heightened standard to prove his prima facie case: He must present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [him] out . . . for discharge for impermissible reasons."  *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990).  The parties do not dispute that Pierson can prove the first three elements of the prima facie case:  He was sixty-two when he was terminated, and he had been performing his job duties competently for at least six years.  Rather, the primary dispute centers upon the fourth element.  Specifically, the parties dispute whether Pierson was "replaced" or terminated as part of a reduction in force.  We must initially determine whether Pierson's position was eliminated as part of a reduction in force, such that he must meet the heightened pleading standard.

In *Barnes*, we described the inquiry a court must undertake to determine whether an employee was terminated as part of a reduction in force:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.  An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.  However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d at 1465.  An employer "replaces" a discharged employee when it reassigns an existing employee to assume the discharged employee's duties in a way that "fundamentally change[s] the nature of his employment."  *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997) (concluding that a part-time employee who was promoted to full-time employment effectively replaced a terminated employee because "[t]his type of reassignment is analogous to

hiring a new employee to cover the terminated employee's duties"). However, we have consistently found that a "plaintiff's job was simply eliminated" when the plaintiff's "former duties were assumed by [a younger employee], who performed them in addition to his other functions." *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir. 1980) (discussing *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975)); *see also Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 726 (6th Cir. 2012); *Geiger*, 579 F.3d at 623.

Pierson has identified record evidence that supports the inference that his position was not truly eliminated, but was instead filled after his departure by DePriest. It is undisputed that DePriest's day-to-day schedule and responsibilities changed after Pierson's termination. DePriest began spending the majority of his time, often five days per week, at the Dickson plant, and he eventually moved his office to Dickson permanently. He still consulted on projects at other plants and occasionally traveled to regional facilities to supervise energy-related or capital projects, but the majority of his time was diverted to managing the Dickson plant. And DePriest's travel reports indicate that his business-related travel was sharply curtailed after transitioning to the Dickson facility.[3] It is also clear that at least one of DePriest's major responsibilities, the management of a large capital project in Merced, California, was "coming to an end" or "scaling down." R. 51-3 (Pierson Dep. at 130) (Page ID #784); R. 51-2 (DePriest Dep. at 61–64) (Page ID #491–94). QG's position that DePriest retained his preexisting duties pertaining to energy management, energy procurement, and project support for other local plants while also assuming Pierson's responsibilities as Plant Facilities Manager is undermined by evidence that both positions were full-time jobs with a "huge workload," and that DePriest's work hours did not increase. Although it is possible that DePriest continued to perform his former energy-procurement functions from his new Dickson location, a reasonable jury could infer that, because DePriest was physically located in the Dickson facility and traveling less frequently while maintaining the same work hours, he was not able to perform fully all of his existing job functions.

---

[3]QG has provided evidence that DePriest continued to travel frequently but chose not to report it or, alternatively, that his travel was reduced because employees company-wide were instructed to limit their travel as part of the Fortress Quad initiative. R. 51-4 (Muehlbach Dep. at 46) (Page ID #984). However, when considering a motion for summary judgment we draw all reasonable inferences from the facts in the nonmoving party's favor. A reasonable jury could conclude based upon the travel reports that DePriest eliminated or reduced his job functions that required travel after assuming Pierson's role.

Moreover, multiple QG employees made statements that support Pierson's claim that DePriest replaced Pierson as the Facilities Manager and abandoned many of his former responsibilities:  Tim Heggie, a Dickson employee, told Pierson that, after he was terminated, DePriest was spending "most of his time at Dickson, doing [Pierson's] job function," R. 51-3 (Pierson Dep. at 134–36) (Page ID #788–90); Jerry Ulickey, a Dickson manager, posted a notice at the Dickson plant stating that "David Depriest [sic] has joined the Dickson Facility in the roll [sic] of Plant Facilities Manager," R. 51-4 (Ulickey Announcement) (Page ID #1400); and QG issued an internal memorandum in October stating that Pierson's job "duties were observed [sic] by an existing engineer by the name of David Depriest [sic]," R. 51-4 (Appeal Mem. at 2) (Page ID #1468).  In addition, at least one QG employee explicitly linked DePriest's name with the idea of replacement:  Snyder, the Dickson human resources professional, produced handwritten notes of her conversation with Lentz regarding Pierson's termination that contained the words "replacement" and "David Depries [sic]."  R. 51-1 (Snyder Notes) (Page ID #390).  Finally, QG's internal reporting structure reflects a definitive change in DePriest's title and responsibilities:  the Dickson plant roster showed that DePriest, with the title Plant Facilities Manager, reported to Lentz, the regional Facilities Manager, at least for a brief time.  R. 51-1 (Plant Roster) (Page ID #392).  QG contends that this reporting change was a mistake, but the documentary evidence at least supports the inference that DePriest stepped into Pierson's position.

To be sure, there is ample evidence that DePriest retained his other job functions even after absorbing Pierson's Facilities Manager job duties.  DePriest testified that, although he was not "as focused" on energy procurement after assuming Pierson's duties, he still maintained his energy-related duties.  R. 51-2 (DePriest Dep. at 35) (Page ID #465).  And QG management consistently stated that DePriest would be maintaining his former responsibilities after also accepting the Facilities Manager responsibilities:  in the same announcement that described DePriest as taking on the Facilities Manager role at Dickson, Ulickey also explained that DePriest would be maintaining his regional responsibilities, R. 51-4 (Ulickey Announcement) (Page ID #1400); Douglas, DePriest's supervisor, continued to categorize DePriest as part of the energy team, R. 51-2 (DePriest Performance Evaluation) (Page ID #638) ("In addition to filling whatever engineering and management role that needed to be filled [at Dickson], David has

maintained his passion for energy management and remains an integrated and engaged member of the Quad/Graphics energy management team."); and Muehlbach understood that DePriest would continue to work on energy and capital projects at other plants even after he transitioned into his new duties at the Dickson plant, R. 51-4 (Muehlbach Dep. at 217, 222) (Page ID #1155, 1160).  However, Pierson has provided enough evidence for a reasonable jury to conclude that DePriest did not retain all of his previous job functions and that he was effectively reassigned to replace Pierson as Facilities Manager.

We conclude that Pierson has presented sufficient evidence to create a genuine dispute regarding whether his position was truly eliminated; therefore, he does not need to meet the heightened standard to prove his prima facie case.  Instead, Pierson bears the burden of proving only that his job was given to a younger employee.  *See Blair*, 505 F.3d at 529.  As we have discussed, Pierson has presented evidence from which a reasonable jury could conclude that DePriest, who was forty-seven years old, replaced him as Facilities Manager.  Accordingly, Pierson has provided evidence to establish his prima facie case of age discrimination.

**B. Pretext**

Because we have determined that Pierson can prove a prima facie case of discrimination, the burden shifts to QG to set forth a legitimate, nondiscriminatory reason for terminating Pierson.  QG carries its burden by asserting that Pierson's position was selected for elimination as part of a company-wide reduction in force instituted in response to stagnating demand and troubling economic conditions.  Specifically, QG asserts that it chose to terminate Pierson because the Dickson plant, where he was Facilities Manager, was under consideration for a significant reduction in operations, and Muehlbach concluded that a full-time manager would no longer be necessary at the plant.  Therefore, the burden shifts back to Pierson to establish that the reason for termination articulated by QG is pretext for age discrimination.

An employee may show that an employer's proffered reason for terminating him was pretext by demonstrating "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (internal quotation marks omitted).  Pierson argues that QG's articulated reason for terminating

him—the reduction in force—was pretextual for three reasons:  (1) the reason had no basis in fact because there was not actually a reduction in force at QG, (2) the reduction in force, if it existed, did not actually motivate the termination decision because Lentz was not aware of the workforce reduction when he decided to discharge Pierson, and (3) the reduction in force did not actually motivate the decision because it was one of two "shifting" justifications for the termination.

QG did conduct a large-scale workforce reduction between 2010 and 2012 and, thus, Pierson's first argument is without merit.  He asserts that, because only two positions, including his own, were eliminated from the Dickson facilities department between July 2, 2010 and December 21, 2011, R. 51-4 (Muehlbach Dep. at 49) (Page ID #987), QG did not actually reduce its workforce.  However, when weighed against undisputed evidence regarding broad cuts and reductions across the company, that only a few employees in a relatively small department at one plant were terminated does not prove, or even raise the inference, that QG did not conduct a reduction in force.  Quadracci, the QG CEO, explicitly instructed executive-level employees to identify positions that could be eliminated without hardship to the company.  In keeping with this directive, managers began reducing operations and headcount at the Dickson plant:  In just the first two months after Pierson's termination on August 23, 2011, a dozen jobs were eliminated at the Dickson plant.  *Id.* at 202 (Page ID #1140).  Between July 2010 and July 2012, employee headcount at the Dickson plant was reduced by sixty percent and operations were curtailed from five presses to only three.  *Id.* at 48, 66–67 (Page ID #986, 1004–05).  And QG also made significant cuts at other facilities, including closing its corporate office space in Franklin and shutting down the Jonesboro, Arkansas plant.  Based upon this evidence, no reasonable jury could conclude that QG did not implement a broad workforce reduction.

Although it is clear that QG did at some point conduct a significant reduction in force, Pierson has presented evidence to show that the reduction in force did not actually motivate the decision to discharge him.  To ascertain what actually motivated QG to terminate Pierson's employment, we must first determine which QG employee or employees contributed to the termination decision.  Both Muehlbach and Lentz claim to have made the termination decision independently.  QG argues that Muehlbach selected Pierson's position for elimination and that

Lentz did not have any role in the decision, even if he independently reached the same conclusion.  Pierson, on the other hand, argues that Lentz made the termination decision after the August 19 meeting of regional managers, and that Muehlbach merely approved it through his communications with corporate human resources. R. 51-1 (Lentz Dep. at 19) (Page ID #286); *id*. (Muehlbach/Dees Email) (Page ID #415).  A reasonable jury could conclude, based on Lentz's testimony and the email communications, that Lentz was the decision maker with regard to Pierson's termination.  Thus, Lentz's knowledge and justifications are relevant to determining QG's actual motivation for discharging Pierson.

Pierson argues that the reduction in force did not actually motivate his termination because Lentz, the decision maker, either (1) was not aware that such a reduction was planned for the Dickson plant or (2) offered "shifting" justifications that cast doubt on whether the reduction in force was his true reason for selecting Pierson for discharge.  The first argument is unpersuasive:  Even if Lentz did not know that the Dickson plant might start reducing its operations, he was aware after the August 19, 2011 meeting that he was expected to eliminate unnecessary employees.  Therefore, his lack of knowledge regarding a large-scale plan to reduce printing operations in specific plants is not evidence of pretext.

Nonetheless, Pierson has presented sufficient evidence of pretext, in the form of Lentz's shifting justifications for terminating him, to create a genuine dispute of material fact.  We have held that:

> Shifting justifications over time calls the credibility of those justifications into question.  By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination.

*Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002); *see also Tinker*, 127 F.3d at 523 (finding that inconsistencies regarding which of two managers made the decision to fire an employee and which of the two offered justifications was the real reason for the decision create a genuine issue of material fact regarding pretext).  Although Lentz claims that he immediately selected Pierson for termination based on his assessment that the Facilities Manager position could be eliminated without hardship to the company, he later justified the decision by

preparing performance evaluations that reflect that Pierson was not a "team player."  R. 51-1 (Criteria for Selection Forms) (Page ID #417).  Subsequently, when Lentz met with Pierson and discharged him, he did not mention that performance deficiencies played any role in the decision. But when Pierson later inquired about appealing the termination decision, a company representative told him that "the decision were [sic] based on performance not age."  R. 51-4 (Appeal Mem. at 2) (Page ID #1468).  Although it is possible that Lentz had Pierson's allegedly poor teamwork in mind when he initially selected him for termination, and that both reasons played a role in Pierson's discharge, a reasonable jury could conclude that Lentz shifted the reasons for his decision over time.  Such shifting justifications raise an inference that the proffered reasons are false and are pretext for discrimination.

Pierson has presented sufficient evidence to create a genuine dispute of material fact regarding several elements of his age-discrimination claims.  Accordingly, summary judgment in favor of QG on the ADEA and THRA claims was improper.

## IV.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 13-5784

JAMES C. PIERSON,
          Plaintiff - Appellant,

   v.

QUAD/GRAPHICS PRINTING CORP. et al.,
          Defendants,

QG, LLC,
          Defendant - Appellee.

> **FILED**
> *Apr 18, 2014*
> DEBORAH S. HUNT, Clerk

Before: MERRITT, MOORE, and CLAY, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's grant of summary judgment in favor of QG is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk